# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

| | |
|---|---|
| W.C. SMITH, Individually on Behalf of Himself and All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>CONSTELLATION ENERGY GROUP, INC., )<br>MAYO A. SHATTUCK III, JAMES R. )<br>CURTISS, FREEMAN A. HRABOWSKI, III )<br>NANCY LAMPTON, MICHAEL D. )<br>SULLIVAN, JAMES T. BRADY, ROBERT J. )<br>LAWLESS, YVES C. DE BALMANN, JOHN )<br>L. SKOLDS, ANN C. BERZIN, EXELON )<br>CORPORATION, and BOLT ACQUISITION )<br>CORPORATION, )<br><br>Defendants. )<br>_____ ) | Civil Action No.<br><br>CLASS ACTION<br><br>SHAREHOLDER CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTY AND VIOLATIONS OF §14(A) AND §20(A) OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 14A-9 OF THE U.S. SECURITIES AND EXCHANGE COMMISSION PROMULGATED THEREUNDER |

## SUMMARY OF THE ACTION

1.      Plaintiff brings this shareholder class action both for himself and on behalf of all the similarly situated public shareholders of Constellation Energy Group, Inc. ("Constellation" or the "Company") against Constellation, Exelon Corporation ("Exelon"), Bolt Acquisition Corporation ("Bolt Acquisition"), and the members of Constellation's Board of Directors (the "Board" or the "Individual Defendants").  This action arises out of defendants' violations of state law and sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder. These violations arise in connection with defendants' attempts to sell Constellation to Exelon for the unfair consideration of 0.930 shares of Exelon common stock in exchange for each Constellation common stock outstanding (the "Proposed Acquisition").  As part of their efforts to secure shareholder approval of the Proposed Acquisition, the defendants have filed with the SEC a false and materially misleading Form S-4 Registration Statement (the "S-4").

2.      In pursuing the unlawful plan to sell the Company via an unfair process and at an unfair price, each of the defendants violated applicable law by directly breaching and/or aiding and abetting the other defendants' breaches of their fiduciary duties of loyalty and due care, as well as federal securities laws.  This action seeks to enjoin the Individual Defendants from further breaching their fiduciary duties in their pursuit of a sale of the Company and from seeking shareholder approval of the Proposed Acquisition without disclosing all material information in the S-4 to Constellation's shareholders in violation of sections 14(a) and 20(a) of the Exchange Act.

3.      Constellation is a leading competitive supplier of power, natural gas, and energy products and services for homes and businesses across the continental United States.  A Fortune 500 company, Constellation maintains a generation business (Generation), a customer supply

business (NewEnergy), and delivers electricity and natural gas through the Baltimore Gas and Electric Company ("BGE"), its regulated utility in central Maryland.  Despite the Company having positioned itself to achieve strong financial performance and growth going forward, as evidenced by the $14.3 billion of revenues the Company generated in 2010, the Individual Defendants have decided to sell Constellation to Exelon via a flawed process and for a meager premium.  Indeed, the Company neither contacted, nor even discussed contacting, other potential bidders, as the Individual Defendants negotiated with Exelon – and only Exelon – throughout the entire strategic process.  As a result, Constellation and its shareholders are now being offered inadequate value for their shares in this promising Company.

4.      In agreeing to the Proposed Acquisition with their preferred suitor, and without any sort of market check, the members of the Board have placed their own interests in securing valuable and prestigious positions in the post-Proposed Acquisition company ahead of their duties to Constellation shareholders.  According to Constellation's Form 8-K filed with the SEC on April 28, 2011, the Company's current Chairman of the Board, President, and Chief Executive Officer ("CEO"), Mayo A. Shattuck, III ("Shattuck"), will continue as Executive Chairman of the Board of the combined company.  To be sure, Shattuck had his eyes set on lucrative post-merger employment with Exelon from the very beginning of the strategic process.  In fact, this topic was discussed well in advance of any discussion of the merger price to be paid and remarkably, before the Board had been formally apprised of the Company's discussions with Exelon.  Moreover, three other current members of Constellation's Board will be joining Shattuck on the combined company's board.  As these Individual Defendants dominate and control the business and corporate affairs of Constellation, there exists an imbalance and disparity of economic power between them and the Company's public shareholders.  Therefore, it is inherently unfair for them to execute and pursue any proposed acquisition under which they will reap disproportionate

benefits to the exclusion of obtaining the maximum shareholder value.  Nonetheless, instead of attempting to negotiate a transaction reflecting the best consideration available for the Constellation shareholders they are duty-bound to serve, the Individual Defendants disloyally placed their own interests first and tailored the terms and conditions of the Proposed Acquisition to meet their own needs and objectives.

5.     To further advance its goal of securing the Proposed Acquisition (and the promise of lucrative post-merger employment), the Board also breached its fiduciary duties by agreeing to certain preclusive deal protection devices in the April 28, 2011 agreement and plan of merger (the "Merger Agreement") relating to the Proposed Acquisition.  These provisions, which collectively preclude any competing offers for the Company, include: (i) a no-solicitation provision prohibiting the Company from adequately shopping itself; (ii) a $200 million termination fee payable to Exelon by the Company if Constellation were to accept a competing bid; and (iii) a five business day matching rights period during which Exelon can match any superior proposal received by the Company.  Though the Merger Agreement purportedly contains a fiduciary out provision, this provision is illusory.  The chances of the Company receiving any sort of offer that could be considered superior by the Board, no matter the price, are miniscule given the Merger Agreement's definition of "Company Superior Offer," which requires that the Board consider regulatory issues and the likelihood and timing of consummation in any proposal it receives.  Given that Constellation and Exelon spent over five months exchanging due diligence and formulating plans to obtain the necessary federal and state regulatory approvals, it is highly unlikely that another bidder will be able to submit an offer that contains a regulatory approval plan without access to critical non-public information, and thus put forth a "superior" offer as contemplated by the Merger Agreement.  These provisions reflect an attempt by the Board to lock up the Proposed Acquisition at a price that grossly undervalues

the Company and leaves Constellation's shareholders with a mere 22% ownership interest in the combined company.

6.      In an attempt to secure shareholder approval of the Proposed Acquisition, on June 27, 2011, defendants filed the materially false and misleading S-4 with the SEC.  The S-4, which recommends that Constellation shareholders vote in favor of the Proposed Acquisition, omits and/or misrepresents material information concerning, among other things: (i) the unfair sales process employed by defendants to sell the Company exclusively to Exelon; (ii) Constellation's and Exelon's financial forecasts; and (iii) the key inputs and assumptions underlying the fairness opinions provided by Constellation's financial advisors, Morgan Stanley & Co. Incorporated ("Morgan Stanley") and Goldman, Sachs & Co. ("Goldman Sachs"), as well as Exelon's financial advisors, Barclays Capital Inc. ("Barclays"), J.P. Morgan Securities LLC ("J.P. Morgan"), and Evercore Group L.L.C. ("Evercore").  These omissions and misstatements constitute both a breach of the defendants fiduciary duties to the Company and its shareholders as well as a violation of sections 14(a) and 20(a) of the Exchange Act.  Without the omitted and materially misrepresented material, Constellation's shareholders simply cannot make a fully informed decision as to whether to vote in favor of the Proposed Acquisition.

7.      To remedy defendants' breaches of their fiduciary duties and other misconduct, plaintiff seeks, inter alia: (i) injunctive relief preventing consummation of the Proposed Acquisition unless and until the Company adopts and implements a procedure to obtain a transaction that provides the best possible terms for shareholders, and defendants disclose all material information concerning the Proposed Acquisition to Constellation's shareholders; (ii) a directive to the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Constellation's shareholders; and (iii) rescission of, to the extent already implemented, the Merger Agreement or any of the terms thereof.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over all claims asserted herein pursuant to section 27 of the Exchange Act for violations of sections 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

9.      Venue is proper in this District because Constellation has its principle place of business in this District.  Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists, and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.  Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts within this District.

## PARTIES

10.     Plaintiff W.C. Smith is, and has been, a shareholder of Constellation at all relevant times.

11.     Defendant Constellation is a Maryland corporation that, through its subsidiaries, offers energy products and services in North America.  The Company's Generation segment develops, owns, operates, and maintains fossil, nuclear, and renewable generating facilities; and manages approximately 1,100 megawatts (MW) associated with long-dated tolling agreements. This segment also provides operation and maintenance services, including testing and start-up to owners of electric generating facilities.  Its NewEnergy segment offers electricity, natural gas, and other energy products and services to wholesale and retail electric and natural gas customers. This segment supplies approximately 119 million MW hours of aggregate electricity to distribution utilities, municipalities, residential, commercial, industrial, and governmental

customers; approximately 334 million British Thermal Units ("BTU") of natural gas to residential, commercial, industrial, and governmental customers; and approximately 7.8 million tons of coal primarily to its own fleet.  It also manages its upstream natural gas activities; designs, constructs, and operates renewable energy, heating, cooling, and cogeneration facilities; provides energy performance contracting and energy efficiency engineering services; and offers home improvements, sales of electric and gas appliances, and servicing of heating, air conditioning, plumbing, electrical, and indoor air quality systems.  Additionally, the Company's Regulated Electric segment purchases, transmits, distributes, and sells electricity in central Maryland and its Regulated Gas segment purchases, transports, and sells natural gas in central Maryland.  Constellation's common stock trades on the New York Stock Exchange under the ticker symbol "CEG" and the Company maintains its principal executive offices at 100 Constellation Way, Baltimore, Maryland.

12.     Defendant Shattuck has served as a Constellation director since May 1999, as the Company's Chairman of the Board since July 2002, and as its President and CEO since November 2001.  Shattuck also served as Chairman of the Board of the Constellation's regulated gas and electric utility, BGE from July 2002 through April 2007.  According to the Company's Annual Proxy Statement filed with the SEC on Form DEF 14A on April 15, 2011 (the "2011 Proxy"), Shattuck is Chair of the Company's Executive Committee.  Upon completion of the Proposed Acquisition, Shattuck will become Executive Chairman of the Board of Exelon.

13.     Defendant Yves C. de Balmann ("de Balmann") has served as a Constellation director since July 2003.  According to the 2011 Proxy, de Balmann is a member of the Company's Compensation Committee and the Nominating and Corporate Governance Committee.

14.     Defendant Ann C. Berzin ("Berzin") has served as a Constellation director since February 2008.  According to the 2011 Proxy, Berzin is a member of the Company's Audit Committee.  In addition, according to the 2011 Proxy, Constellation received payments of $2.5 million in 2009 from Kindred Healthcare, Inc. ("Kindred") for energy supply services provided by subsidiaries of the Company.  Berzin is a non-management member of Kindred's board of directors.

15.     Defendant James T. Brady ("Brady") has served as a Constellation director since May 1999. According to the 2011 Proxy, Brady is Chair of the Company's Audit Committee and is a member of the Executive Committee.  Additionally, according to the 2011 Proxy, Brady serves as a non-management director of McCormick & Company, Inc. ("McCormick").  Constellation received payments of $7 million, $8.6 million, and $7 million in 2008, 2009, and 2010, respectively, from McCormick for energy supply services provided by BGE and other subsidiaries of Constellation.  Constellation also received payments of $5.2 million and $5.5 million from T. Rowe Price Group, Inc. ("T. Rowe Price") in 2009 and 2010, respectively, where Brady also is a non-management director, for energy supply services provided by BGE and other subsidiaries of Constellation.

16.     Defendant James R. Curtiss ("Curtiss") has served as a Constellation director since April 1999.  According to the 2011 Proxy, Curtiss is Chair of the Company's Committee on Nuclear Power and is a member of the Executive Committee.  Additionally, according to the 2011 Proxy, Curtiss Constellation and its nuclear joint-venture made payments of $35.3 million, $16.4 million, and $15.6 million in 2008, 2009, and 2010, respectively, to Cameco Corporation ("Cameco") for the purchase of uranium to operate the nuclear plants owned by the nuclear joint venture and the storage of uranium.  Curtiss is a non-management member of Cameco's board of directors.  Furthermore, in 2008 Constellation paid approximately $116,000 to the law firm of

Winston & Strawn LLP, where Curtiss was a partner until April 2008, for legal services rendered in 2008.

17.     Defendant Freeman A. Hrabowski, III ("Hrabowski") has served as a Constellation director since April 1999 and also previously served as a BGE director from 1994 through April 1999.  According to the 2011 Proxy, Hrabowski is Chair of the Company's Nominating and Corporate Governance Committee and is a member of the Executive Committee and the Compensation Committee.  Additionally, Hrabowski is also a member of the McCormick board of directors along with defendant Brady and, as detailed above, Constellation received of $7 million, $8.6 million, and $7 million in 2008, 2009, and 2010, respectively, from McCormick for energy supply services provided by BGE and other subsidiaries of Constellation. Constellation has also provided regulated gas and electric services to Hrabowski's residences. Furthermore, the Company, through its subsidiaries, received $1.2 million in 2008, 2009, and 2010 from the University of Maryland Baltimore County ("UMBC") where Hrabowski serves as President.  In addition, according to the 2011 Proxy, Constellation made a contribution of $205,000 to UMBC in 2010.

18.     Defendant Nancy Lampton ("Lampton") has served as a Constellation director since April 1999.  According to the 2011 Proxy, Lampton is a member of the Company's Committee on Nuclear Power.

19.     Defendant Robert J. Lawless ("Lawless") has served as a Constellation director since January 2002.  According to the 2011 Proxy, Lawless is Chair of the Company's Compensation Committee and is a member of the Executive Committee and the Nominating and Corporate Governance Committee.

20.     Defendant John L. Skolds ("Skolds") has served as a Constellation director since November 2007.  Moreover, Skolds served as Executive Vice President of Exelon and President

of Exelon Energy Delivery from December 2003 until his retirement in September 2007.  He also served as President of Exelon Generation from March 2005 through September 2007 and from March 2002 through December 2003, Skolds served as Senior Vice President of Exelon and President and Chief Nuclear Officer of Exelon Nuclear.  According to the 2011 Proxy, Skolds is a member of the Company's Audit Committee and the Committee on Nuclear Power.

21.     Defendant Michael D. Sullivan ("Sullivan") has served as a Constellation director since April 1999, as a BGE director since September 2008 and as chairman of BGE's board of directors since August 2009.  Sullivan also previously served as a BGE director from 1992 through April 1999.  According to the 2011 Proxy, Sullivan is a member of the Company's Audit Committee.  In addition, according to the 2011 Proxy, Constellation has provided regulated gas and electric services to Sullivan's residences.

22.     Defendant Exelon is a Pennsylvania corporation that maintains its principal executive offices at 10 South Dearborn Street, Chicago, Illinois.  Exelon, a utility services holding company, through its subsidiaries, engages in the generation, transmission, distribution, and sale of electricity to residential, commercial, industrial, and wholesale customers in northern Illinois.  Exelon also generates electricity from nuclear, fossil, and hydroelectric generation facilities and it sells electricity and natural gas on retail basis to customers in southeastern Pennsylvania.

23.     Defendant Bolt Acquisition is a Maryland corporation and a wholly-owned subsidiary of Exelon Corporation that was created to effectuate the Proposed Acquisition.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

24.     As directors and/or officers of the Company, defendants Shattuck, de Balmann, Berzin, Brady, Curtiss, Hrabowski, Lampton, Lawless, Skolds, and Sullivan are in a fiduciary relationship with Constellation, plaintiff, and the other public shareholders of the Company.

Accordingly, they owe them the highest obligations of loyalty, good faith, fair dealing, due care, candor, and full and fair disclosure. A fundamental element of the Board's fiduciary duties, which they breached here, is to exercise meaningful oversight over Company management.

25. To diligently comply with their fiduciary duties, the trustees and/or officers may not take any action that, inter alia:

(a) adversely affects the value provided to the Company's shareholders;

(b) will discourage, inhibit, or deter alternative offers to purchase control of the Company or its assets;

(c) contractually prohibits themselves from complying with their fiduciary duties;

(d) will otherwise adversely affect their duty to secure the best value reasonably available under the circumstances for the Company and its shareholders; and/or

(e) will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

26. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Constellation, are further obligated to refrain from, inter alia:

(a) participating in any transaction where the directors or officers' loyalties are divided;

(b) participating in any transaction where the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the Company's public shareholders; and/or

(c) unjustly enriching themselves at the expense or to the detriment of the public shareholders.

27.     Defendants, separately and together, in connection with the Proposed Acquisition, are knowingly or recklessly violating their fiduciary duties and aiding and abetting such breaches, including their duties of loyalty, good faith, and independence owed to plaintiff and other public shareholders of Constellation.   As outlined herein, certain defendants are also obtaining for themselves personal benefits, including personal financial benefits not shared equally by plaintiff or the Class (as defined herein). Accordingly, the Proposed Acquisition will benefit the Individual Defendants in significant ways not shared with the Class. As a result, neither plaintiff nor the Class will receive adequate or fair value for their Constellation common stock in the Proposed Acquisition.

28.     Because the Individual Defendants are knowingly or recklessly breaching their duties of loyalty, good faith, and independence in connection with the Proposed Acquisition, the burden of proving the inherent or entire fairness of the Proposed Acquisition, including all aspects of its negotiation, structure, price, and terms, is placed upon defendants as a matter of law.

### BACKGROUND OF THE PROPOSED ACQUISITION

29.     Constellation is a leading competitive supplier of power, natural gas, and energy products and services for homes and businesses across the continental United States.   The Company has positioned itself to maintain strong financial performance and growth through the execution of numerous acquisitions and other strategic initiatives in recent years and its 2010 financial performance, especially its $14.3 billion in revenues, indicates as much.   Should the Proposed Acquisition be consummated, however, Constellation shareholders will have their interests in the growing Company severely diminished in exchange for the grossly inadequate proposed consideration.

30.     Defendant Shattuck recently touted these strategic initiatives and their benefits to the Company in Constellation's February 4, 2011 earnings press release.  The press release states, in relevant part:

> **"We ended 2010 having completed all of the strategic initiatives we announced at the start of the year, successfully putting our core businesses in a stronger position to operate more efficiently, strengthen existing customer relationships and win new business,"** said Mayo A. Shattuck III, chairman, president and chief executive officer of Constellation Energy. "We completed our goal of deploying more than $1 billion of cash to acquire strategically located generation assets, including the 2,950- megawatt Boston Generating fleet in New England and the 550-megawatt Colorado Bend Energy Center near Wharton, Texas. **Through acquisitions and organic growth, we significantly increased our generation capacity during the year, laying the foundation for continued growth** in our wholesale and retail energy supply businesses in regions where our load obligations exceed our physical generating capacity.
>
> "Our NewEnergy segment maintained its focus on selling customers innovative products and services, such as on-site solar installations," Shattuck said. "In September, we announced the acquisition of CPower, increasing our managed load response to approximately 1,500 megawatts and making us the second-largest load response provider in competitive commercial and industrial markets. We also made a strategic decision to offer electricity to residential customers in Maryland and New Jersey, growing to more than 80,000 customers by year end.
>
> "Baltimore Gas and Electric Company (BGE), our regulated utility, exceeded its targets for safety, customer service and financial performance for the year," Shattuck said. "In August, BGE received Maryland Public Service Commission (PSC) approval to deploy one of the most ambitious smart grid programs in the nation. When fully implemented, this initiative will lead to improvements in service and reliability, and facilitate expected customer savings of more than $2.5 billion over the life of the program. BGE also received a summary order from the PSC on its combined electric and gas rate filing —the first such filing in more than 17 years. BGE is awaiting receipt of the PSC's comprehensive order detailing its findings.
>
> "Looking ahead, we believe our investments in clean generation, efficiency and new products put us in strong position to benefit as the energy market recovers," Shattuck said.

31.     Indeed, these developments resulted in the Company's stock price increasing steadily in the fourth quarter of 2010 and continuing on into 2011 as indicated by the following chart:





32.    Despite the upward trend in the Company's stock price and its position within the industry, senior management at Constellation and Exelon began having informal meetings to discuss a possible transaction between the two companies.  The S-4 does not indicate when these "informal conversations" between Shattuck and John W. Rowe ("Rowe"), Chairman and CEO of Exelon first occurred, only that they were sometime prior to the October 2010 discussions that eventually resulted in the Proposed Acquisition.

33.    On October 13, 2010, Mr. Christopher M. Crane ("Crane"), President and Chief Operating Officer ("COO") of Exelon, contacted Shatttuck to "introduce the possibility of discussing a potential merger of Exelon and Constellation."   The conversation included a discussion of the financial advisors each company anticipated using for a transaction and the regulatory approvals that would be required in connection with any possible transaction.

34.    On or about October 25, 2010, Rowe called Shattuck to follow-up on Crane's October 13, 2010 call.  While the parties agreed to move forward with the Proposed Acquisition

between Constellation and Exelon, the S-4 fails to disclose whether Constellation ever made any attempts to contact, or even considered contacting, other potential bidders.

35.    While the S-4 states that, in the past six years, Constellation had entered into three strategic transactions spanning a period of nearly four years from December 2005 to November 2009.  The Board could not have reasonably concluded, based on this stale information of the market, that it possessed knowledge of what other bidders would be willing to pay for the Company at the end of 2010.

36.    Beginning in late October 2010, senior management of Constellation retained outside professional advisors to assist and provide advice concerning the proposed merger. Constellation initially retained Morgan Stanley to act as its financial advisor.  However, shortly before executing the Merger Agreement, in early April 2011, Constellation retained Goldman Sachs as an additional financial advisor.  Then, in mid-April 2011, Credit Suisse Securities (USA) LLC ("Credit Suisse") was also retained.  Defendants have not disclosed why the Board felt it necessary to retain two additional financial advisors nor does it disclose the roles that each of these additional advisors played in connection with the Proposed Acquisition.  Ultimately, Morgan Stanley and Goldman Sachs rendered fairness opinions but Credit Suisse did not.

37.    On November 1 and 2, 2010, while attending a meeting of the Edison Electric Institute ("EEI") in Palm Desert, California, Crane and Shattuck had a series of discussions. During these discussions, Crane stated that if Exelon were to pursue an all-stock transaction with Constellation, it would expect to issue shares of Exelon stock at an exchange ratio that would represent a premium of approximately 15% over the then-current trading price of Constellation's common stock.  Defendant Shattuck indicated that he thought any possible transaction would need to result in a premium in excess of 15%.  However, in mid-November, 2010, the parties

agreed that they would "delay discussion of the exchange ratio in a possible transaction until regulatory assessments had been made."

38.     While defendant Shattuck deemed it too early to discuss the exchange ratio and the total consideration to be received by Constellation shareholders, it was not too early to begin discussing his post-merger employment.  At a November 30, 2010 dinner, Shattuck and Rowe discussed "Rowe's expectations for management roles in the combined company" for Crane and Shattuck.

39.     While the exact date that Rowe and Shattuck began discussing a potential transaction is not disclosed, Constellation's Board was not formally apprised of the discussions until December 17, 2010.  At this time, defendant Shattuck first informed the Constellation Board about his conversations with Rowe and Crane concerning a potential transaction and the actions of Constellation's senior management and outside financial advisors over the course of the prior several weeks.   While Shattuck purportedly did informally update certain members of the Board about his conversations with Rowe and Crane in mid to late November 2010, the S-4 fails to disclose the names of these Board members, or why Shattuck only contacted some members as opposed to the whole Board.

40.     On January 7, 2011, Constellation and Exelon executed a mutual confidentiality agreement and on January 20, 2011, a joint defense agreement was executed to allow the parties to share due diligence materials and develop a joint approach to address the regulatory requirements involved in a potential acquisition.

41.     On January 20, 2011, the Board attended a dinner where members of Constellation's senior management team, including defendant Shattuck, and a representative of Morgan Stanley presented what they considered the strategic and financial benefits of Exelon's potential acquisition of Constellation.

42.     The next day, at the Board meeting and during the executive session at the beginning of the meeting where only the Board was present, the Board asked a subgroup of four Constellation directors, (defendants Lawless, Berzin, Brady, and de Balmann) to serve on a special committee to work with Constellation senior management to further evaluate the potential acquisition of Constellation by Exelon.   The S-4 fails to disclose how the special committee members were selected, the role the special committee would play, or the extent of the special committee's authority.   Additionally, the S-4 does not disclose whether the Board discussed the possibility of other potential buyers coming forward or whether Company management should attempt to contact other potential suitors.

43.     On February 11, 2011, the special committee held a meeting with Constellation's senior management team.   The group discussed "the opportunities presented by the possible transaction and also discussed Constellation's stand-alone business plan."   Again, the S-4 fails to mention whether there was any discussion about contacting other potential bidders.

44.     On March 1, 2011, senior management of Exelon and Constellation, including Rowe, Crane, and Shattuck, met in Washington, D.C. while attending an EEI meeting to discuss the status of the possible transaction, including the status of the regulatory process.   It was at this meeting, and a subsequent meeting held on March 2, 2011, that the parties agreed to begin preparing a draft merger agreement.   Shortly thereafter, Exelon instructed their legal advisors, Skadden Arps, Slate, Meagher & Flom, LLP to begin working on a draft merger agreement outlining the terms of the Proposed Acquisition.   No exchange ratio had yet been proposed by either company.

45.     It was not until April 14, 2011, five months after the companies agreed to delay a discussion concerning the exchange ratio – but well after the merger between Constellation and Exelon was all but guaranteed to occur – that Exelon's financial advisor informed Morgan

Stanley that Exelon was prepared to offer 0.909 shares of Exelon common stock for each share of Constellation common stock outstanding.  The next day, Morgan Stanley countered with an exchange ratio of a 0.945 shares of Exelon for each Constellation share.  The S-4 does not disclose how Morgan Stanley arrived at this exchange ratio.

46.     On April 18, 2011, the Constellation Board met.  While it appears several issues were discussed at this meeting, the S-4 does not indicate whether the exchange ratio (and the negotiations concerning it) was a key talking point.  In any event, later that day, Shattuck and Crane spoke by telephone and mutually agreed that an exchange ratio of 0.930 shares of Exelon per Constellation share was acceptable.

47.     On April 21, 2011, representatives of Constellation and Exelon met with Maryland Governor Martin O'Malley and informed him of "the possible transaction and the rate payer credits and state and local investment and employment commitments that the parties expected to propose in connection with the possible transaction."  They also discussed the likelihood of obtaining regulatory approval in Maryland.

48.     Shortly after this April 21, 2011 meeting, the defendants executed the Merger Agreement underlying the Proposed Acquisition and thereafter made this information known to the public.

## THE PROPOSED ACQUISITION

49.     On April 28, 2011, Constellation and Exelon issued a joint press release announcing that they had entered into the Merger Agreement pursuant to which Constellation shareholders would receive 0.930 shares of Exelon common stock in exchange for each share of Constellation common stock they owned.  Based on Exelon's closing share price on April 27, 2011, Constellation shareholders would receive approximately $38.59 per share, resulting in a transaction value of around $7.9 billion.  The press release stated in pertinent part:

**CHICAGO AND BALTIMORE** (April 28, 2011) – The boards of directors of Exelon Corporation (NYSE: EXC) and Constellation Energy (NYSE: CEG) announced today that they have signed a definitive agreement to combine the two companies in a stock-for-stock transaction. The agreement brings together Exelon's large, environmentally-advantaged generation fleet and Constellation's industry-leading customer-facing businesses, creating a platform for growth and delivering stakeholder benefits.

The resulting company will retain the Exelon name and be headquartered in Chicago. Exelon's power marketing business (Power Team) and Constellation's retail and wholesale business will be consolidated under the Constellation brand and be headquartered in Baltimore. Both companies' renewable energy businesses will also be headquartered in Baltimore, and the three utilities within the new Exelon – BGE, ComEd and PECO – will remain standalone organizations.

Exelon Chairman and CEO John W. Rowe said, "This merger creates the number one competitive energy provider with one of the industry's cleanest and lowest-cost power generation fleets and one of the largest commercial, industrial and residential customer bases in the United States. Both Exelon and Constellation have demonstrated their commitment to sustainability and competitive markets, helping drive innovation, efficiency, customer choice and better rates. Together, we will be an even stronger advocate for achieving these ideals."

*   *   *

**Terms of the Transaction**

The market capitalization of the combined company will be $34 billion with an enterprise value of $52 billion. Under the merger agreement, Constellation's shareholders will receive 0.930 shares of Exelon common stock in exchange for each share of Constellation common stock. Based on Exelon's closing share price on April 27, 2011, Constellation shareholders would receive a value of $38.59 per share, or $7.9 billion in total equity value.

The exchange ratio represents an 18.1 percent premium to the 30-day average closing stock prices of Exelon and Constellation as of April 27, 2011.

Following completion of the merger, Exelon shareholders will own approximately 78 percent of the combined company and Constellation shareholders approximately 22 percent on a fully diluted basis.

The combination is anticipated to be break-even to Exelon's adjusted earnings in 2012; in 2013, it is expected to be accretive to earnings by more than 5 percent.

Based on Exelon's current annual cash dividend rate of $2.10 per common share, Constellation shareholders would receive an approximate 103 percent dividend increase, or $0.99 per Constellation share over the current Constellation annual dividend.

**Leadership, Board Structure and Headquarters**

Shattuck will become executive chairman of the combined company. Crane will become president and CEO. Under the agreement, Rowe will retire upon closing of the transaction.

Both Crane and Shattuck will serve on the 16-member board of directors of the combined company, 12 members of which will be designated from Exelon's board of directors and four from Constellation's.

Following the merger, the resulting company will retain the Exelon name and be headquartered in Chicago. In addition to the corporate headquarters, Illinois will continue to be home to ComEd and Exelon Business Services Company (both in Chicago), as well as the Midwest regional headquarters for Exelon Nuclear (in Warrenville).

Pennsylvania will continue to be home to headquarters for PECO (in Philadelphia) and Exelon Power (in Kennett Square). Exelon Nuclear's headquarters will also be located at Kennett Square.

Exelon's and Constellation's commercial retail and wholesale businesses will be consolidated under the Constellation brand and headquartered in Baltimore. BGE will retain its Baltimore headquarters.

BGE, ComEd and PECO will remain headquartered in Baltimore, Chicago and Philadelphia, respectively, focused on safety, customer service, reliability and consistent infrastructure investment within their jurisdictions. However, the merger is expected to benefit customers as all three utilities work together to share best practices to continually improve performance.

50.     Following consummation of the Proposed Acquisition, the combined company

will retain the Exelon name and be headquartered in Chicago, Illinois.  Defendant Shattuck will

become executive chairman of the combined company and Exelon's current COO and President, Crane, will become President and CEO of the successor company.   Under the Merger Agreement, current Exelon Chairman and CEO, Rowe, will retire upon closing of the Proposed Acquisition.   Additionally, both Shattuck and Crane will serve on the combined company's sixteen-member board of directors which will consist of twelve members from Exelon's board of directors and four from Constellation's.

51.     Although Exelon is paying a 16% premium based on the average closing price of both stocks over the past twenty days prior to the April 28, 2011 announcement of the Proposed Acquisition, according to an April 28, 2011 article published by *Bloomberg*, "it is below the 19 percent average of 456 U.S. power company deals over the past five years."   That same article goes on to state that "Exelon is paying 6.9 times earnings before interest, taxes, depreciation and amortization, compared with an average 7.2 times."

52.     The Merger Agreement does not contain any "collar" which would guarantee that the Company's shareholders receive at least some minimal dollar amount in exchange for their shares under the 0.930 exchange ratio.   Thus, the Company and its shareholders are at the mercy of the value of Exelon shares at the "Effective Time" as defined in the Merger Agreement, which may be affected by numerous factors unrelated to Constellation's worth and therefore have little or no relationship to the actual value of the Company.   A "collar" is particularly important here because defendants have stated that they do not expect the deal to close until the first quarter of 2012, leaving a long period of time for stock fluctuation to occur that could negatively affect the value Constellation shareholders receive.

53.     The Proposed Acquisition, if consummated, will deny Class members of their right to share proportionately and equitably in the anticipated growth in the Company's profits and earnings for the coming years.   As a result, the Individual Defendants breached their

fiduciary duties owed to the Company and its public shareholders by depriving Constellation shareholders of their right to receive adequate and fair value for their shares in the Proposed Acquisition.

## THE PRECLUSIVE DEAL PROTECTION DEVICES

54.     On April 28, 2011, the Company filed a Form 8-K with the SEC disclosing the Merger Agreement.   The Merger Agreement contained a number of provisions specifically designed to prevent another bidder from making a superior proposal, thus effectively locking up the deal in favor of Exelon.

55.     First, section 8.2 of the Merger Agreement requires Constellation to pay Exelon a termination fee of $200 million if it accepts a superior proposal.  This provision is unfair to the Company's shareholders and contrary to their interests because it deters and prevents the submission of higher proposals, especially in connection with the no-solicitation clause found in section 6.4 and discussed more fully below.

56.     The "No Solicitation" provision referenced above ensured, in contravention of Maryland law, that any post-Merger Agreement market check would not occur.  Specifically, this provision prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit, or may have submitted, unsolicited alternative proposals.   Section 6.4(a) of the Merger Agreement states:

> The Company agrees that neither it nor any Subsidiary of the Company, nor any of their respective officers, directors or employees, shall, and that it shall use its reasonable best efforts to cause its and their respective Representatives not to (and shall not authorize or give permission to its and their respective Representatives to), directly or indirectly: (i) solicit, initiate, seek or knowingly encourage the making, submission or announcement of any Company Acquisition Proposal, (ii) furnish any nonpublic information regarding the Company or any of its Subsidiaries to any Person (other than Parent or Merger Sub) in connection with or in response to a Company Acquisition Proposal, (iii) continue or otherwise engage or participate in any discussions or negotiations with any Person (other

than Parent or Merger Sub) with respect to any Company Acquisition Proposal, (iv) approve, endorse or recommend any Company Acquisition Proposal except in connection with a Company Change of Recommendation pursuant to Section 6.4(e) or (v) except in connection with a Company Change of Recommendation pursuant to Section 6.4(e), enter into any letter of intent, arrangement or understanding relating to any Company Acquisition Transaction (other than a confidentiality agreement as contemplated by this Section 6.4(a)).

57. Though the Merger Agreement ostensibly has a purported "fiduciary out" provision that allows the Company to negotiate with other bidders, this provision is actually illusory when viewed in conjunction with other sections of the Merger Agreement. In order for Constellation to negotiate with other suitors, the potential acquirer would first have to make an unsolicited superior offer. However, the Merger Agreement defines "Company Superior Offer" as:

> [A] bona fide written Company Acquisition Proposal (for purposes of this definition, replacing all references in such definition to twenty percent (20%) with fifty percent (50%)) on terms that the Company's Board of Directors determines, in good faith, after consultation with its outside counsel and its financial advisor, would be, if consummated, more favorable to the Company's stockholders than the Merger and the transactions contemplated by this Agreement (including any proposal by Parent to amend the terms of this Agreement) from a financial point of view, *after taking into account, to the extent applicable, all legal, financial, regulatory* and other aspects of the Company Acquisition Proposal that the Board of Directors of the Company considers relevant, including the identity of the Person making the Company Acquisition Proposal *and the likelihood and timing of consummation*.

As indicated, the likelihood of obtaining regulatory approval will figure prominently in any Board determination of whether an offer from another bidder is "superior" to the Exelon offer. Indeed, two previously proposed acquisitions involving Constellation – one with Potomac Electric Power Company in 1997 and another with FPL Group, Inc. in 2006 – fell apart precisely because of the extremely burdensome regulatory approval process or the inability to obtain the required regulatory approvals.

58. As detailed *ad nausea* in the S-4, the regulatory approval process is likely to be time-consuming and requires a considerable amount of preparation. Indeed, the S-4 chronicles

the significant amount of time – over five months – which Constellation and Exelon representatives devoted to discussing, planning, and implementing proposals to obtain the required regulatory approval in connection with the Proposed Acquisition.  Constellation and Exelon jointly retained the firm of Saul Ewing LLP to provide "advice and representation to both companies on regulatory matters in Maryland," and representatives from both companies even met with Maryland Governor Martin O'Malley to discuss the Proposed Acquisition and "the likelihood of regulatory approval in Maryland" from the Maryland Public Service Commission.

59.     Here, the parties to the Merger Agreement were required to obtain approval from three states (New York, Texas, and Pennsylvania) in addition to Maryland.  Moreover, approval from three federal agencies was also required pursuant to: (i) the Hart-Scott-Rodino Antitrust Improvements Act, which requires approval from the Antitrust Division of the Department of Justice and the Federal Trade Commission; (ii) the Federal Power Act, which provides that no holding company in a holding company system that includes a transmitting utility or electric utility shall purchase, acquire, merge, or consolidate with a transmitting utility, an electric utility, or holding company in a holding system that includes a transmitting utility or electric utility without prior Federal Energy Regulatory Commission authorization; and (iii) the Atomic Energy Act, whereby a Nuclear Regulatory Commission ("NRC") power plant licensee must seek an obtain prior NRC consent for the indirect transfer of its NRC licenses from the transfer of control over the licensee in a merger.

60.     Given the sheer number of federal and state regulatory approvals required for an energy company like Constellation to merge, it is doubtful that any alternative bidder would be able to submit a "Company Superior Offer" without access to certain critical non-public information concerning the Company as only with that information would they be able to formulate a regulatory approval plan likely to obtain the requisite regulatory clearances.

Accordingly, since the Board is required under the Merger Agreement to consider "regulatory" aspects, as well as the "timing and likelihood of consummation" (and given that it is virtually impossible to obtain regulatory approval absent access to non-public Company documents) no alternative bidders are likely to emerge.

61.    Simply put, the no-solicitation provision in the Merger Agreement, when combined with the definition of "Company Superior Offer," all but ensures that no superior offer will come about.  Additionally, when the $200 million termination fee is factored in, the Board is even more unlikely to ever deem another offer as a "Company Superior Offer" because if the alternative proposal is not consummated (e.g., does not obtain the required regulatory approvals), Constellation is on the hook for the entire $200 million.

62.    The Merger Agreement presents other obstacles that further deter a superior offer from materializing.  Pursuant to Section 6.4, Constellation must notify Exelon of any proposals, offers, or any overtures of interest from other potential suitors (including the identity of such suitors) within twenty-four hours of their being received.  Then, pursuant to Section 6.4(e)'s "matching rights" clause, Exelon has five days to consider and match the terms of any proposal the Company may have received which is deemed superior.  This further dissuades competing bidders from emerging.  Specifically, Section 6.4(e) of the Merger Agreement states:

> The Board of Directors of the Company may at any time prior to receipt of the Company Stockholder Approval, (A) effect a Company Change of Recommendation in respect of a Company Acquisition Proposal; and (B) terminate this Agreement pursuant to Section 8.1(c)(iii) in order to enter into a written definitive agreement providing for a Company Acquisition Transaction, if (and only if): (i) a Company Acquisition Proposal is made to the Company by a third party, and such offer is not withdrawn; (ii) the Company's Board of Directors determines in good faith after consultation with its financial advisors that such offer constitutes a Company Superior Offer; (iii) following consultation with outside legal counsel, the Company's Board of Directors determines that the failure to take such action would be reasonably likely to result in a breach of its fiduciary duties under applicable Laws; (iv) the Company provides Parent five (5) Business Days' prior written notice of its intention to take such action, which notice shall include the information with respect to such Company Superior Offer

- 24 -

that is specified in Section 6.4(b) (it being understood that any material revision or amendment to the terms of such Company Superior Offer shall require a new notice and, in such case, all references to five (5) Business Days in this Section 6.4(e) shall be deemed to be three (3) Business Days); and (v) at the end of the five (5) Business Day period described in clause (iv), the Board of Directors of the Company again makes the determination in good faith after consultation with its outside legal counsel and financial advisors *(after negotiating in good faith with Parent and its Representatives, if requested by Parent, during such five (5) Business Day period regarding any adjustments or modifications to the terms of this Agreement proposed by Parent and taking into account any such adjustments or modifications)* that the Company Acquisition Proposal continues to be a Company Superior Offer and that the failure to take such action would be reasonably likely to result in a breach of its fiduciary duties under applicable Laws.

63.     Collectively, the aforementioned onerous and preclusive deal protection were agreed to by the Individual Defendants to help secure the personal benefits and unshared profits afforded to them through the Proposed Acquisition and all but ensure that no superior proposals will emerge for the Company.

## THE MATERIALLY MISLEADING S-4

64.     In order to secure shareholder approval of this unfair deal, defendants filed the materially misleading S-4 on June 27, 2011.  The S-4, which recommends that Constellation shareholders approve the Proposed Acquisition, omits and/or misrepresents material information about, among other things: (i) the unfair sales process employed by defendants to sell the Company to Exelon and only Exelon; (ii) Constellation's and Exelon's financial forecasts; (iii) the key inputs and assumptions underlying the fairness opinions provided by Constellation's financial advisors, Morgan Stanley and Goldman Sachs, as well as Exelon's financial advisors, Barclays, J.P. Morgan, and Evercore.  This information was known to the Individual Defendants, or was within the Individual Defendants' control.   Specifically, the S-4 omits and/or misrepresents the material information set forth below in contravention of §§14(a) and 20(a) of the Exchange Act.

65.     ***The Sales Process Leading to the Proposed Acquisition.***   The Background of the Merger section, which purports to describe the process leading up to the execution of the Merger Agreement, fails to disclose to shareholders numerous material facts concerning, among other things, the Company's decision to engage in exclusive negotiations with its preferred bidder Exelon, the lack of active Board involvement in the management-run strategic process, and the reasons behind Constellation's retention of three financial advisors, one of whom did not even submit a fairness opinion.   Specifically, the S-4 fails to disclose:

(a)     Why no other potential bidders were contacted when the last of Constellation's three "major strategic transactions" – all of which, according to the S-4, informed Constellation "about the opportunities for strategic transactions and how potential strategic partners would likely value Constellation's business" – occurred in November 2009.   Without this information, shareholders do not know whether the Board was truly informed regarding what others were willing to pay for the Company, or if other potential bidders were interested in buying the Company at the time of the most recent strategic review process;

(b)     Whether the Board considered using exclusive negotiations with Exelon as a bargaining chip to extract things in return from Exelon.   The absence of this information creates a misleading picture as to whether the Board took the necessary steps to obtain the best value reasonably available to Constellation shareholders from Exelon;

(c)     Whether the Board formally met to discuss defendant Shattuck's negotiations with Exelon prior to December 17, 2010, and what, if anything, the Board authorized or resolved.   This omission gives the appearance that the Board acquiesced in letting management, specifically Shattuck, run the strategic process, even though Shattuck had personal interests in ensuring that a deal with Exelon was completed that were not shared equally with the other Constellation shareholders;

(d)     The reasons behind the Board's decision to engage both Goldman Sachs and Credit Suisse as additional financial advisors at the very end of the process in April 2011. Such information is material because Constellation had already retained Morgan Stanley to act as its financial advisor in connection with the Proposed Acquisition and the appearance of the additional financial advisors appears unnecessary;

(e)     The role Credit Suisse played in the Proposed Acquisition, including whether Credit Suisse was asked to render a fairness opinion, why it did not do so, and what fee, if any, was (or will be) paid to Credit Suisse for its role in the Proposed Acquisition.  Additional information concerning Credit Suisse's role is necessary because, according to the S-4, Constellation specifically "engaged Credit Suisse … as a financial advisor to Constellation for the potential transaction" yet the work they did was not disclosed despite its potential usefulness to Company shareholders in deciding whether to approve the Merger Agreement; and

(f)     How Morgan Stanley derived the exchange ratio of a 0.945 share of Exelon common stock that it proposed to Barclays.  This information is material to shareholders because without it, they are left to speculate as to how Morgan Stanley valued the Company at that time, and how/why the eventual lower exchange ratio contained in the Proposed Acquisition was ultimately agreed to by the parties.

66.     The aforementioned information is material as, without it, shareholders are left with an incomplete and misleading picture of the process employed by defendants in selling the Company and are therefore unable to determine whether the Board took all the steps necessary to maximize shareholder value.  It is patently unfair to ask shareholders to vote on the Proposed Acquisition without a complete picture of why they are being asked to give up their equity stake in Constellation and instead accept equity in a go-forward company primarily controlled by Exelon's management and directors.

67.   *Certain Financial Projections of Constellation and Exelon.*   The S-4 fails to disclose the original and adjusted financial projections by each of Constellation's and Exelon's management teams for years 2011 through 2015 for the following items: (i) revenue; (ii) EBITDA; (iii) EBIT (or D&A); (iv) taxes (or tax rate); (v) changes in working capital; and (vi) unlevered free cash flow.   In addition, the S-4 also fails to disclose the projections at the business level for both companies (Regulated Utility, Unregulated Generation, NewEnergy line, and other businesses for Constellation, and Regulated Utility "PECO & ComEd," Merchant Generation, and other businesses for Exelon).   These projections represent Constellation's and Exelon's managements' best estimates of the respective companies' future financial performance.   The omission of these projections renders it impossible for Constellation shareholders to compare the Proposed Acquisition with the Company's prospects as a standalone entity should it remain independent, and determine which alternative is more favorable.   In addition, without this information, Constellation shareholders are unable to independently assess whether the financial analyses set forth in the S-4, which rely on these projections, adequately value the Proposed Acquisition, and in turn, what weight, if any, to place on the various fairness opinions of the parties respective financial advisors.

68.   *Morgan Stanley's Financial Analyses.*   Constellation retained Morgan Stanley to serve as the Company's financial advisor in connection with the Proposed Acquisition.   On April 27, 2011, Morgan Stanley rendered its fairness opinion, the full text of which is attached to the S-4.   Several key inputs and assumptions are missing from the financial analyses underlying the fairness opinion.   Without these key inputs and assumptions, the description of these analyses are materially misleading as shareholders are unable to understand how the various analyses were performed and whether they were performed correctly.   Accordingly, Constellation's shareholders are unable to accurately assess whether the analyses are adequate measures by

which to evaluate the Proposed Acquisition before deciding how to vote on the Merger Agreement.   In addition, this information is material in that it is necessary for purposes of allowing shareholders to determine what weight, if any, to place on Morgan Stanley's fairness opinion.   Specifically, the following financial analyses lack key inputs and assumptions, and are therefore misleading: (i) Morgan Stanley's Comparable Public Companies; (ii) Morgan Stanley's Sum-of-the-Parts Discounted Cash Flow Analysis for Constellation; (iii) Morgan Stanley's Sum-of-the-Parts Discounted Cash Flow for Exelon; (iv) Morgan Stanley's Analysis of Selected Precedent Transactions; (v) Morgan Stanley's Pro Forma Transaction Analysis; and (vi) Morgan Stanley's Pro Forma Trading Analysis.

(a)   ***Morgan Stanley's Comparable Public Companies Analysis.***   In Morgan Stanley's Comparable Public Companies Analysis, the S-4 fails to disclose: (i) the summary statistics for each of the comparable companies; (ii) the PRICE/2012E EPS and PRICE/2013E EPS multiples for each of the selected comparable companies, and the low, mean, median, and high multiples; (iii) the multiples Morgan Stanley applied to the 2012 and 2013 EPS estimates of Constellation and Exelon to derive the ranges of implied equity values per share for each company; and (iv) if Morgan Stanley's is opining as to the financial fairness of the exchange ratio, why there is no exchange ratio included as part of this analysis.   This information is material as, without it, shareholders are unable to independently assess whether Morgan Stanley's analysis is an adequate measure of commonly used valuation measurements of the Company compared to the selected comparable companies.

(b)   ***Morgan Stanley's Sum-of-the-Parts Discounted Cash Flow Analysis for Constellation.***   In Morgan Stanley's Sum-of-the-Parts Discounted Cash Flow Analysis for Constellation, the S-4 fails to disclose: (i) the other non-cash expenses added back to derive the unlevered free cash flows, and the magnitude of these add-backs; (ii) how Morgan Stanley

derived the range of terminal P/E multiples (12.0x to 14.0x) and discount rate range (5.0% to 6.0%) used in its valuation of Constellation's regulated utility business; (iii) Constellation's projected net debt in 2015 used by Morgan Stanley in its analysis; (iv) how Morgan Stanley derived the range of terminal EBITDA multiples (7.0x to 8.0x) and discount rate range (8.0% to 9.0%) used in its valuation of Constellation's unregulated generation business; (v) how Morgan Stanley derived the range of terminal EBITDA multiples (4.0x to 5.0x) and discount rate range (11.0% to 13.0%) used in its valuation of Constellation's NewEnergy line of business; (vi) how Morgan Stanley derived the discount rate (6.0%) used for Constellation's unallocated corporate level expenses and other items in its analysis; and (vii) the value of each of the business segments individually.  This information is material in that, without it, shareholders are unable to assess whether the analysis was performed properly, and in turn, what weight, if any, to place on Morgan Stanley's fairness opinion.

(c)     *Morgan Stanley's Sum-of-the-Parts Discounted Cash Flow for Exelon.* In Morgan Stanley's Sum-of-the-Parts Discounted Cash Flow for Constellation, the S-4 fails to disclose: (i) which forecast – the Exelon projections or the adjusted Exelon projections – was used to derive the valuation ranges for Exelon in the analysis; (ii) how Morgan Stanley derived the range of terminal P/E multiples (12.0x to 14.0x) and discount rate range (5.0% to 6.0%) used in its valuation of each of Exelon's regulated utility businesses; (iii) Exelon's projected net debt in 2015 used by Morgan Stanley in its analysis; (iv) how Morgan Stanley derived the range of terminal EBITDA multiples (7.0x to 8.0x) and discount rate range (8.0% to 9.0%) used in its valuation of Exelon's unregulated generation business; (v) the value of each of the business segments individually; and (vi) why there is no exchange ratio included as part of this analysis. Again, this information is material in that, without it, shareholders are unable to assess whether

the analysis was performed properly, and in turn, what weight, if any, to place on the fairness opinion provided by Morgan Stanley.

(d)   ***Morgan Stanley's Analysis of Selected Precedent Transactions.***   In Morgan Stanley's Analysis of Selected Precedent Transactions, the S-4 fails to disclose: (i) the announced date, target company name, acquiring company name, transaction value, transaction premium, and Price/2011E Earnings multiples for each of the selected precedent transactions observed as part of this analysis; (ii) why Morgan Stanley applied a premium to Exelon's share price of $40.65 as of April 21, 2011, to derive an implied range of values per share for Constellation in the analysis, given that Exelon is the buyer, not the seller, so the value of its shares should not be increased for a transaction premium prior to calculating the exchange ratio; and (iii) why there is no exchange ratio included as part of this analysis.   Without this information, shareholders are unable to fully understand how the Selected Precedent Transactions Analysis was performed and independently assess whether the analysis is an adequate measure of Constellation's true value.

(e)   ***Morgan Stanley's Pro Forma Transaction Analysis.***   In Morgan Stanley's Pro Forma Transaction Analysis, the S-4 fails to disclose: (i) the estimated amount of accretion to Exelon's earnings from 2012 through 2014; and (ii) the estimated amount of accretion due to Constellation's earnings for 2012 and dilution from 2013 through 2014.   This information is material to shareholders in that it would allow them to independently assess whether this analysis is an adequate measure by which to evaluate the sufficiency of the proposed consideration being offered before voting on whether to approve the Merger Agreement.

(f)   ***Morgan Stanley's Pro Forma Trading Analysis.***   In Morgan Stanley's Pro Forma Trading Analysis, the S-4 fails to disclose: (i) the sensitivities to Constellation's potential future stock price provided by Constellation management to Morgan Stanley for each of the

years 2012, 2013, and 2014, and how those sensitivities affected the results of this analysis; and (ii) the illustrative price-to-earnings multiple range, derived from historical trading analyses, used by Morgan Stanley in the analysis.  The failure to disclose management's estimate prevents the shareholders from evaluating the value Constellation is adding to the go-forward prospects for the combined company and, thus, whether the Proposed Acquisition provides the shareholders with consideration that reflects this added value.

69.     ***The Services Rendered by Morgan Stanley to Constellation and/or Exelon.***  The S-4 fails to disclose how much compensation Morgan Stanley received from Constellation, Exelon, or any of their affiliates in the last two years.  The failure to disclose this information prevents the shareholders from properly considering whether Morgan Stanley may have been conflicted by virtue of having a greater financial interest to ensure that a deal with Exelon was completed on a favorable basis due to their past dealings.  This information is thus vital for Constellation shareholders to determine whether Morgan Stanley's objectivity may have been compromised, and in turn, what weight, if any, to place on Morgan Stanley's fairness opinion.

70.     ***Goldman Sachs' Financial Analyses.***  Constellation also retained Goldman Sachs to serve as the Company's financial advisor in connection with the Proposed Acquisition.  On April 28, 2011, Goldman Sachs rendered its fairness opinion regarding the Proposed Acquisition, the full text of which is attached to the S-4.  Several key inputs and assumptions are missing from the financial analyses that underlie the fairness opinion.  Without these key inputs and assumptions, the descriptions of the analyses are materially misleading because shareholders are unable to independently understand how the various analyses were performed and whether they were performed correctly, and thereby assess whether the analyses are adequate measures by which to evaluate the Proposed Acquisition before deciding how to vote.  In turn, this information is relevant for purposes of allowing shareholders to determine what weight, if any, to place on Goldman Sachs' fairness opinion.  Specifically, the following financial analyses lack

key inputs and assumptions, and are therefore misleading: (i) Goldman Sachs' Selected Companies Analysis; (ii) Goldman Sachs' Illustrative Discounted Cash Flow Sum-of-the-Parts Analysis of Constellation; (iii) Goldman Sachs' Illustrative Present Value of Future Share Price Analysis of Constellation; (iv) Goldman Sachs' Illustrative Discounted Cash Flow Analysis of Exelon; (v) Goldman Sachs' Illustrative Present Value of Future Share Price Analysis of Exelon; (vi) Goldman Sachs' Contribution Analysis; and (vii) Goldman Sachs' Illustrative Pro Forma Present Value of Future Value Analysis.

(a) ***Goldman Sachs' Selected Companies Analysis.*** In Goldman Sachs' Selected Companies Analysis, the S-4 fails to disclose: (i) the summary statistics for each comparable company; and (ii) the EV/2012E EBITDA, EV/2013E EBITDA, Price/2012E Earnings, and Price/2013E Earnings multiples for each of the selected comparable companies, and the mean and media multiples observed in the analysis. This information is material as, without it, shareholders cannot independently evaluate whether Goldman Sachs' analysis is an adequate measure of commonly used valuation measurements of the Company compared to the selected comparable companies.

(b) ***Goldman Sachs' Illustrative Discounted Cash Flow Sum-of-the-Parts Analysis of Constellation.*** In Goldman Sachs' Illustrative Discounted Cash Flow Sum-of-the Parts Analysis of Constellation, the S-4 fails to disclose: (i) how Goldman Sachs derived the range of discount rates (7.0% to 9.0%) and terminal EBITDA multiples (6.5x to 8.5x) used in its valuation of Constellation, excluding the NewEnergy line of business; and (ii) how Goldman Sachs derived the range of discount rates (11.0% to 15.0%) and terminal EBITDA multiples (3.0x to 5.0x) used in its valuation of the NewEnergy line of business. This information is material because the discounted cash flow analysis calculates the present value of the Company's future cash flows, and, without the omitted information, shareholders cannot independently

assess whether Goldman Sachs' analysis as set forth in the S-4 is an adequate measure of the Company's future cash flows.

(c)   ***Goldman Sachs' Illustrative Present Value of Future Share Price Analysis of Constellation.***   In Goldman Sachs' Illustrative Present Value of Future Share Price Analysis of Constellation, the S-4 fails to disclose: (i) Constellation's net debt and fully diluted number of shares outstanding as of year-end 2013 and 2014 used by Goldman Sachs in its analysis; and (ii) how Goldman Sachs derived the range of discount rates (9.5% to 11.5%) used in its analysis.  This information is material in that, if provided, it would allow Constellation's shareholders to determine whether the analysis was performed properly, and in turn, what weight, if any, to place on Goldman Sachs' fairness opinion.

(d)   ***Goldman Sachs' Illustrative Discounted Cash Flow Analysis of Exelon.***   In Goldman Sachs' Illustrative Discounted Cash Flow Analysis of Exelon, the S-4 fails to disclose: (i) how Goldman Sachs derived the range of discount rates (6.5% to 8.5%) and terminal EBITDA multiples (6.75x to 8.75x) used in its analysis; and (ii) why Goldman Sachs did not perform a sum-of-the-parts analysis on Exelon when it did so for Constellation and other advisors did so for Exelon.  As the discounted cash flow analysis calculates the present value of Exelon's future cash flows, this information is material to shareholders so that they can independently assess whether this Goldman Sachs' analysis is an appropriate and representative measure of Exelon's value.

(e)   ***Goldman Sachs' Illustrative Present Value of Future Share Price Analysis of Exelon.***   In Goldman Sachs' Illustrative Present Value of Future Share Price Analysis of Exelon, the S-4 fails to disclose: (i) Exelon's net debt and fully diluted number of shares outstanding as of year-end 2013 and 2014 used by Goldman Sachs in its analysis; and (ii) how Goldman Sachs derived the range of discount rates (8.5% to 10.5%) used in its analysis.

Absent this material information, Constellation shareholders are unable to independently assess whether the analysis was performed properly, and in turn, what weight, if any, to place on Goldman Sachs' fairness opinion.

(f)    ***Goldman Sachs' Contribution Analysis.***   In Goldman Sachs' Contribution Analysis, the S-4 fails to disclose the contribution percentages for each of Constellation and Exelon for 2011 through 2013 pro forma EBITDA and 2011 through 2013 pro forma Net Income.  Without this information shareholders are unable to independently assess whether the consideration being offered in the Proposed Acquisition adequately reflects the value of Constellation to the combined company.

(g)    ***Goldman Sachs' Illustrative Pro Forma Present Value of Future Value Analysis.***   In Goldman Sachs' Illustrative Pro Forma Present Value of Future Value Analysis, the S-4 fails to disclose the pro forma combined company's net debt and fully diluted number of shares outstanding as of year-end 2013 and 2014 used by Goldman Sachs in its analysis.  This information is material as, without it, the shareholders cannot determine whether the analysis was performed properly.  Accordingly, they cannot determine what, if any, weight to afford the fairness opinion of Goldman Sachs.

71.    ***The Services Rendered by Goldman Sachs to Constellation and/or Exelon.***   The S-4 fails to disclose: (i) the specific services Goldman Sachs has provided to Constellation, or any of its affiliates, in the last two years, and how much compensation was received for services rendered; and (ii) how much compensation Goldman Sachs has received from Exelon, or any of its affiliates, in the last two years in exchange for its services.  Again, without this information shareholders are unable to determine whether Goldman Sachs may have been conflicted or otherwise had its objectivity compromised and, if so, what weight, if any, to place on its fairness opinion.

72.    ***Barclays' Financial Analyses.***   In addition to the fairness opinions of Morgan Stanley and Goldman Sachs, the S-4 also contains the fairness opinion of Barclays, whom Exelon retained as its financial advisor in connection with the Proposed Acquisition.  On April 27, 2011, Barclays rendered its fairness opinion, the full text of which is attached to the S-4.  Full disclosure of all aspects of Barclays' fairness opinion is material as the Proposed Acquisition is structured as a stock-for-stock transaction, meaning that Constellation's shareholders must ultimately decide if they want to discontinue their equity holding in Constellation in exchange for an equity holding in Exelon.  Moreover, as part of its fairness opinion, Barclays performed financial analyses on the value of Constellation.  The description of the analyses supporting the fairness opinion is misleading, however, because several key inputs and assumptions are omitted. Without the key inputs and assumptions, shareholders are unable to independently understand how the various analyses were performed, and thereby assess whether the analyses are adequate measures by which to evaluate the Proposed Acquisition, and what weight, if any, to place on Barclays' fairness opinion in determining whether to approve the Merger Agreement. Specifically, the following financial analyses lack key inputs and assumptions, and are therefore materially misleading: (i) Barclays' Selected Comparable Company Analysis; (ii) Barclays' Consolidated Trading Analysis; (iii) Barclays' Sum-of-the-Parts Trading Analysis; (iv) Barclays' Consolidated Discounted Cash Flow Analysis; (v) Barclays' Sum-of-the-Parts Discounted Cash Flow Analysis; (vi) Barclays' Contribution Analysis; and (vii) Barclays' Pro Forma Merger Analysis.

(a)    ***Barclays' Selected Comparable Company Analysis.***   In Barclays' Selected Comparable Company Analysis, the S-4 fails to disclose: (i) the summary statistics for each comparable company; (ii) the Firm Value/2010E EBITDAR, Firm Value/2011E EBITDAR, Firm Value/2012E EBITDAR, Equity Value/2011E Net Income (integrated only), and Equity

Value/2012E Net Income (integrated only) multiples for each of the selected integrated and merchant generation comparable companies and the low, mean, median, and high statistics observed in the analysis; (iii) the Firm Value/2010E EBITDA, Firm Value/2011E EBITDA, Firm Value/2012E EBITDA, Equity Value/2011E Net Income, and Equity Value/2012E Net Income multiples for each of the selected transmission & distribution comparable companies and the low, mean, median, and high summary statistics observed in the analysis; and (iv) the selected companies used for the "Competitive Retail Supply Comparables."  This information is material as, without it, shareholders are unable to independently assess whether Barclays' analysis is an adequate measure of commonly used valuation measurements of the Company compared to the selected comparable companies.

(b)  ***Barclays' Consolidated Trading Analysis.***  In Barclays' Consolidated Trading Analysis, the S-4 fails to disclose: (i) the 2011 and 2012 adjusted EBITDAR and adjusted net income estimates for Exelon used by Barclays in its analysis; (ii) the 2011 and 2012 adjusted EBITDAR and adjusted net income estimates for Constellation, as adjusted by Exelon management and used by Barclays in its analysis; and (iii) the range of implied equity per share for each of the companies individually.   This information is material as, without it, the shareholders cannot determine whether the analysis was performed properly and thus what weight, if any, to place on Barclays' fairness opinion.

(c)  ***Barclays' Sum-of-the-Parts Trading Analysis.***  In Barclays' Sum-of-the-Parts Trading Analysis, the S-4 fails to disclose: (i) the 2011 and 2012 adjusted EBITDA estimates for Exelon used by Barclays in its analysis; (ii) the 2011 and 2012 adjusted EBITDA estimates for Constellation used by Barclays in its analysis; and (iii) the range of implied equity value per share for each of the companies individually.   Again, this information is material to shareholders in their determination of whether the analysis is being performed properly.

(d)     ***Barclays' Consolidated Discounted Cash Flow Analysis.***   In Barclays' Consolidated Discounted Cash Flow Analysis, the S-4 fails to disclose: (i) how Barclays derived the range of discount rates (6.26% to 7.26%) used in its valuation of Exelon; (ii) how Barclays derived the range of discount rates (6.41% to 7.41%) used in its valuation of Constellation; and (iii) the range of implied equity value per share for each of the companies individually.  As the discounted cash flow analysis calculates the present value of Exelon's future cash flows, this information is material in that shareholders can use it to independently assess whether this Barclays' analysis provides an adequate and representative measure of the Company's value to Exelon.

(e)     ***Barclays' Sum-of-the-Parts Discounted Cash Flow Analysis.***   In Barclays' Sum-of-the-Parts Discounted Cash Flow Analysis, the S-4 fails to disclose: (i) how Barclays derived the discount rates for ComEd and PECO (6.18%) and the Exelon Generation business (7.35%) used in its analysis; (ii) how Barclays derived the discount rates for BGE (6.12%), Constellation generation (7.46%), and the Constellation NewEnergy line of business (10.09%) used in its analysis; and (iii) the range of implied equity value per share for each of the companies individually.  Again, this information is material in that shareholders can use it to independently assess whether this Barclays' analysis provides an adequate and representative measure of the companies' respective values in comparison to one another.

(f)     ***Barclays' Contribution Analysis.***   In Barclays' Contribution Analysis, the S-4 fails to disclose the individual contribution percentages for each of the selected metrics for Exelon and Constellation.  Without this information shareholders cannot determine whether the analysis is being performed properly and thus what weight, if any, to afford Barclays' fairness opinion.

(g) ***Barclays' Pro Forma Merger Analysis.***  In Barclays' Pro Forma Merger Analysis, the S-4 fails to disclose the estimated amounts of accretion/dilution in years 2012-2015 using Exelon projections and in years 2012-2013 using IBES estimates, both including and excluding the effects of purchase accounting.  This information is material in that it allows shareholders to determine whether the analysis is being performed properly by Barclays.

73.  ***The Services Rendered by Barclays to Constellation and/or Exelon.***  The S-4 fails to disclose: (i) how much compensation Barclays received from Exelon, Constellation, or any of their affiliates in the last two years; and (ii) the specific services Barclays is currently providing to any of the parties involved in the Proposed Acquisition, or their affiliates, and how much compensation is expected to be received.  The failure to disclose this information prevents the shareholders from properly considering whether Barclays may have had a financial interest in ensuring the Proposed Acquisition was completed on terms favorable to Exelon due to their past dealings and the payment structure for their current work.  This information is thus vital for Constellation shareholders in determining what weight, if any, to place on Barclays's fairness opinion.

74.  ***J.P. Morgan's Financial Analyses.***  The S-4 also contains the fairness opinion of J.P. Morgan, whom Exelon retained to serve as an additional financial advisor in connection with the Proposed Acquisition.  On April 27, 2011, J.P. Morgan rendered its fairness opinion, the full text of which is attached to the S-4.  Full disclosure of all aspects of J.P. Morgan's fairness opinion is material as the Proposed Acquisition is structured as a stock-for-stock transaction, meaning that Constellation's shareholders must ultimately decide if they want to discontinue their equity holding in Constellation and instead receive equity in Exelon.  Moreover, as part of its fairness opinion, J.P. Morgan performed financial analyses on the value of Constellation.  The description of the analyses supporting the fairness opinion is misleading, however, because several key inputs and assumptions are omitted.  Without the key inputs and assumptions, these

analyses are materially misleading because shareholders are unable to independently understand how the various analyses were performed, and thereby assess whether the analyses are adequate measures by which to evaluate the Proposed Acquisition, and what weight, if any, to place on J.P. Morgan's fairness opinion in determining how to vote on the Proposed Acquisition. Specifically, the following financial analyses lack key inputs and assumptions, and are therefore misleading: (i) J.P. Morgan's Sum-of-the-Parts Discounted Cash Flow Analysis; (ii) J.P. Morgan's Consolidated Trading Comparables Analyses; (iii) J.P. Morgan's Sum-of-the-Parts Trading Comparable Analyses; (iv) J.P. Morgan's Contribution Analysis; (v) J.P. Morgan's Analysis of Merger Impact on EPS and FCF; and (vi) Other Information Concerning J.P. Morgan's Fairness Opinion.

    (a)   ***J.P. Morgan's Sum-of-the-Parts Discounted Cash Flow Analysis.*** In J.P. Morgan's Sum-of-the-Parts Discounted Cash Flow Analysis, the S-4 fails to disclose: (i) how J.P Morgan derived assumptions for each of Constellation's business segments, including the perpetuity growth range (1.50% to 2.00%) and discount rate range (5.25% to 5.75%) for the regulated segment, the terminal EBITDA multiples (4.5x to 5.5x) and discount rate range (9.50% to 10.50%) for the retail business, the terminal EBITDA multiples (4.5x to 5.5x) and discount rate range (9.50% to 10.50%) for the wholesale business, the terminal EBITDA multiples (0.5x to 1.5x) and discount rate range (12.50% to 13.50%) for the trading business, the comparable transactions since February 2009 used to derive the median amount paid per MCFE/D of $9,204 in the Upstream Gas business, the terminal EBITDA multiples (7.75x to 8.25x) and discount rate range (7.0% to 8.0%) for the Non-Nuclear Generation business, and the terminal EBITDA multiples (7.75x to 8.25x) and discount rate range (7.0% to 8.0%) for the Nuclear Generation business; and (ii) how J.P Morgan derived the assumptions for each of Exelon's business segments, including the perpetuity growth rate range (1.50% to 2.00%) and discount rate range

(5.25% to 5.75%) for the PECO segment, the perpetuity growth rate range (1.50% to 2.00%) and discount rate range (5.25% to 5.75%) for the ComEd segment, the terminal EBITDA multiples (8.25x to 8.75x) and discount rate range (6.5% to 7.5%) for the Generation segment, and the terminal EBITDA multiples (8.0x to 8.5x) and discount rate range (5.74% to 6.84%) for other businesses.  This information is material as, without the omitted information, shareholders cannot independently assess whether Goldman Sachs' analysis as set forth in the S-4 is an adequate measure of the Company's future cash flows and, in turn, what, if any, weight to place on J.P. Morgan's fairness opinion.

(b) ***J.P. Morgan's Consolidated Trading Comparables Analyses.***  In J.P. Morgan's Consolidated Trading Comparables Analyses, the S-4 fails to disclose: (i) the summary statistics for each comparable company; and (ii) the Price/CY2012E EPS and Firm Value/CY2012E EBITDA multiples for each of the selected comparable companies and the low, mean, median, and high summary states observed in the analyses.  This information is material as, without it, shareholders are unable to independently assess whether Barclays' analysis is an adequate measure of commonly used valuation measurements of the Company compared to the selected comparable companies.

(c) ***J.P. Morgan's Sum-of-the-Parts Trading Comparable Analyses.***  In J.P. Morgan's Sum-of-the-Parts Trading Comparable Analyses, the S-4 fails to disclose: (i) the comparable companies, and their respective multiples, selected by J.P. Morgan to be the most comparable to the individual business segments of both Exelon and Constellation; and (ii) the multiples selected and applied by J.P. Morgan to each of Exelon's and Constellation's business segments.  This information is material as shareholders need it in order to determine whether the analysis is being performed properly and thus what weight, if any, to afford J.P. Morgan's fairness opinion.

(d)     *J.P. Morgan's Contribution Analysis.*   In J.P. Morgan's Contribution Analysis, the S-4 fails to disclose the contribution percentages for each of Constellation and Exelon for 2011-2015 estimated leverage-adjusted EBITDA and 2011-2015 estimated net income.  Without this information shareholders cannot determine whether the analysis is being performed properly by J.P. Morgan.

(e)     *J.P. Morgan's Analysis of Merger Impact on EPS and FCF.*   In J.P. Morgan's Analysis of Merger Impact on EPS and FCF, the S-4 fails to disclose: (i) the estimated amount of EPS and FCF accretion/dilution in years 2012-2015 using Exelon projections and the adjusted Constellation projections; and (ii) the estimated amount of EPS accretion/dilution in years 2012-2013 using publicly available Wall Street research analysts' estimates and taking into account the effects of synergies, purchase accounting, and other pro forma adjustments.  This information is material to Constellation's shareholders as it would allow them to independently assess whether this analysis is an adequate measure by which to evaluate the sufficiency of the proposed consideration being offered before voting on whether to approve the Merger Agreement.

(f)     *Other Information Concerning J.P. Morgan's Fairness Opinion.* In the Other Information section, the S-4 fails to disclose: (i) the announced date, target company name, acquiring company name, transaction value, and LTM EBITDA multiples for each of the selected precedent hybrid/independent power producer utility transactions observed in the analysis; and (ii) the range of LTM EBITDA multiples selected by J.P. Morgan to derive the implied range of equity values per share in its precedent transaction analysis.  Without this information, shareholders are unable to properly evaluate the adequacy of this analysis, and thus what weight, if any, to afford J.P. Morgan's fairness opinion.

75. ***The Services Rendered by J.P. Morgan to Constellation and/or Exelon.*** The S-4 fails to disclose: (i) how much compensation J.P. Morgan received from Exelon, Constellation, or any of their affiliates in the last two years; and (ii) the specific services J.P. Morgan is currently providing to any of the parties involved in the Proposed Acquisition, or their affiliates, and how much compensation is expected to be received. The failure to disclose this information prevents the shareholders from properly considering whether J.P. Morgan may have had a financial interest in ensuring the Proposed Acquisition was completed on terms favorable to Exelon due to their past dealings and the payment structure for their current work. This information is thus vital for Constellation shareholders in determining what weight, if any, to place on J.P. Morgan's fairness opinion.

76. ***Evercore's Financial Analyses.*** Finally, the S-4 contains the fairness opinion of Evercore, whom Exelon retained to serve as a third financial advisor in connection with the Proposed Acquisition. On April 27, 2011, Evercore rendered its fairness opinion, the full text of which is attached to the S-4. Full disclosure of all aspects of Evercore's fairness opinion is material here because the Proposed Acquisition is structured as a stock-for-stock transaction, meaning Constellation's shareholders must ultimately decide if they want to discontinue their equity holding in Constellation in exchange for equity in Exelon. Moreover, as part of its fairness opinion, Evercore performed financial analyses on the value of Constellation. The description of the analyses supporting the fairness opinion is misleading, however, because several key inputs and assumptions are omitted. Without the key inputs and assumptions, these analyses are materially misleading because shareholders are unable to independently understand how the various analyses were performed, and thereby assess whether the analyses are adequate measures by which to evaluate the Proposed Acquisition, and what weight, if any, to place on Evercore's fairness opinion in determining how to vote on the Proposed Acqusition. Specifically, the following financial analyses lack key inputs and assumptions, and are therefore

misleading: (i) Evercore's Sum-of-the-Parts Analysis; (ii) Evercore's Discounted Cash Flow Analysis; and (iii) Evercore's Selected Peer Group Trading Analysis.

(a)  ***Evercore's Sum-of-the-Parts Analysis.***  In Evercore's Sum-of-the-Parts Analysis, the S-4 fails to disclose: (i) in valuing ComEd and PECO of Exelon, the comparables Evercore selected in its analysis, the Enterprise Value/CY 2012 Evercore observed/used, the Enterprise Value/CY2013 EBITDA Evercore observed/used, the Equity Value/CY2012 EPS Evercore observed/used, Equity Value/CY2013 EPS Evercore observed/used, the 2012 Equity Book Value Evercore observed/used, the 2013 Equity Book Value Evercore observed/used, and the inputs Evercore used in determining a discount rate range of 5.5% to 6.5%; (ii) in valuing the Exelon's Generation business, the generation capacity and multiples on a dollars per kilowatt basis Evercore observed/used, why Evercore used transaction data to value the generation business of the buyer (presumably, Exelon's assets do not deserve a premium because they are not the subject of the change in control transaction), Exelon's nuclear uprate program cash flows generated for the fiscal years ending December 31, 2011 through December 31, 2020, and the inputs Evercore used in determining a discount rate of 8.0%; (iii) in valuing Constellation's Regulated Utility Segment, the comparables Evercore selected in its analysis, the Enterprise Value/CY2012 EBITDA Evercore observed/used, the Enterprise Value/CY2013 EBITDA Evercore observed/used, the Equity Value/CY2012 EPS Evercore observed/used, the Equity Value/CY2013 EPS Evercore observed/used, the 2012 Equity Book Value Evercore observed/used, the 2013 Equity Book Value Evercore observed/used, and the inputs Evercore used in determining a discount rate range of 5.5% to 6.5%; (iv) in valuing Constellation's Unregulated Generation Segment, the generation capacity and multiples on a dollars per kilowatt basis that Evercore observed/used; (v) in valuing Constellation's Retail/Marketing Segment, the comparables Evercore selected in its analysis and the type and range of multiples Evercore

selected an applied in its analysis; and (vi) how Evercore derived the discount rate (7.5%) used in its analysis to value the synergies.  This information is material to Constellation shareholders in their determination of whether Evercore performed the analysis properly, and in turn, what weight, if any, to place on Evercore's fairness opinion.

(b)    ***Evercore's Discounted Cash Flow Analysis.***   In Evercore's Discounted Cash Flow Analysis, the S-4 fails to disclose: (i) how Evercore derived the range of discount rates (6.5% to 7.5%) and terminal EBITDA multiples (6.5x to 7.5x) used in its valuation of Exelon; and (ii) how Evercore derived the range of discount rates (6.5% to 7.5%) and terminal EBITDA multiples (6.0x to 7.0x) used in its valuation of Constellation.   Without this information, shareholders are unable to assess whether the analysis was performed properly by Evercore.

(c)    ***Evercore's Selected Peer Group Trading Analysis.***   In Evercore's Selected Peer Group Trading Analysis, the S-4 fails to disclose the TEV/CY2012E EBITDA, TEV/CY2013E EBITDA, Price/CY2012E EPS, and Price/CY2013E EPS multiples for each of the selected comparable companies observed in the analysis.  This information is material as, without this information, shareholders are unable to independently assess whether the analysis is an adequate measure of Constellation's value to Exelon.

77.    ***The Services Rendered by Evercore to Constellation and/or Exelon.***  The S-4 fails to disclose the specific services Evercore provided to Exelon, or any of its affiliates, in the last two years, and how much compensation was received for services rendered.   This information is material in that it allows Constellation shareholders to determine whether Evercore might have been conflicted in any way which might impact the weight, if any, they want to give to Evercore's fairness opinion.

78.     Defendants were aware of their duty to disclose the foregoing material information in the S-4, and acted with at least negligence in failing to ensure that this material information was disclosed.   Absent disclosure of this material information, shareholders are unable to make an informed decision about whether to vote in favor of the Proposed Acquisition, and are thus threatened with irreparable harm warranting injunctive relief.   Constellation shareholders will continue to suffer irreparable harm absent judicial intervention.

### SELF-DEALING

79.     By reason of their positions with Constellation, the Individual Defendants have access to non-public information concerning the financial condition and prospects of the Company.   Thus, there exists an imbalance and disparity of knowledge and economic power between the Individual Defendants and the public shareholders of Constellation.   Therefore, it is inherently unfair for the Individual Defendants to execute and pursue any proposed acquisition agreement under which they will reap disproportionate benefits to the exclusion of obtaining the best value for shareholders.   Still, the Individual Defendants disloyally placed their own interests first, and tailored the terms and conditions of the Proposed Acquisition to meet their own personal needs and objectives.

80.     Specifically, defendant Shattuck secured for himself and the other Individual Defendants prestigious and lucrative positions at the post-Proposed Acquisition company. According to Constellation's 8-K, filed April 28, 2011:

> Pursuant to the Merger Agreement, upon consummation of the Merger, Exelon will add to its Board of Directors four current Constellation directors, comprised of three independent directors and Mayo A. Shattuck III, currently Chairman of the Board of Directors, President and Chief Executive Officer of Constellation, who will become Executive Chairman of the Board of Directors of Exelon.   By the end of 2012, the number of directors constituting the Board of Directors of Exelon shall be 16, including the four Constellation designees.

81.     The continued employment of defendant Shattuck and his fellow Board members was a priority for him from the very beginning of the strategic process.  According to the S-4, Shattuck met with Rowe to discuss Exelon's expectations for management roles in the combined company on November 30, 2010.  Not only was this meeting well in advance of any negotiations regarding the ultimately agreed upon exchange ratio, but it occurred almost three weeks before the Constellation Board was even apprised about discussions concerning a possible transaction with Exelon.

## CLASS ACTION ALLEGATIONS

82.     Plaintiff brings this action for himself and on behalf of all holders of Constellation common stock which have been or will be harmed by the conduct described herein (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

83.     This action is properly maintainable as a class action.

84.     The Class is so numerous that joinder of all members is impracticable.  As of April 21, 2011, there were over 201 million shares of Constellation common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

85.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  These common questions include, among others, the following:

(a)     whether the S-4 contains material misstatements or omissions in violation of sections 14(a) and 20(a) of the Exchange Act;

(b)     whether the Individual Defendants have breached their fiduciary duties of undivided loyalty, independence, or due care with respect to plaintiff and the other Class members in connection with the Proposed Acquisition;

(c)     whether the Individual Defendants are engaging in self-dealing in connection with the Proposed Acquisition;

(d)     whether the Individual Defendants have breached their fiduciary duty of candor to plaintiff and the Class by soliciting shareholder votes in favor of the Proposed Acquisition based upon inadequate disclosures;

(e)     whether the Individual Defendants have breached any of their other fiduciary duties owed to plaintiff and the Class, including the duties of good faith, diligence, and fair dealing;

(f)     whether Constellation aided and abetted the Individual Defendants' breaches of fiduciary duty;

(g)     whether Bolt Acquisition aided and abetted the Individual Defendants' breaches of fiduciary duty;

(h)     whether the Individual Defendants, in bad faith and with improper motives, impeded or erected barriers to discourage others from making an offer to acquire the Company or its assets; and

(i)     whether plaintiff and the other members of the Class would suffer irreparable injury if the Proposed Acquisition were consummated.

86.     Plaintiff's claims are typical of the claims of the other Class members and plaintiff does not have any interests adverse to the Class.  In addition, plaintiff has retained competent counsel experienced in litigation of this nature and will fairly and adequately represent and protect the interests of the Class. Accordingly, plaintiff is an adequate Class representative.

87.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for defendants or adjudications

with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other Class members not party to those adjudications.

88.     Plaintiff anticipates that there will be no difficulty in the management of this litigation.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

89.     Defendants have acted, or refused to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### Against the Individual Defendants, Constellation, Exelon, and Bolt Acquisition for Violations
### of Section 14(a) of the Exchange Act and SEC Rule 14a-9 Promulgated Thereunder

90.     Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

91.     During the relevant period, the Individual Defendants, Constellation, Exelon, and Bolt Acquisition prepared, reviewed, and/or disseminated the false and misleading S-4 identified above.   The S-4 misrepresented and/or omitted material facts, including material information about the actual intrinsic value of the Company as determined by Constellation's various financial advisors.

92.     In so doing, the Individual Defendants, Constellation, Exelon, and Bolt Acquisition made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of §14(a) of the 1934 Act and SEC Rule 14a-9 promulgated thereunder.   By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose it in the S-4.   Accordingly, they were at least negligent in filing the S-4 with these materially false and misleading statements.

93.     The omissions and false and misleading statements in the S-4 are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Acquisition.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the S-4 and in other information reasonably available to shareholders.

94.     Because of the false and misleading statements in the S-4, Plaintiff and the Class are threatened with irreparable harm, rendering money damages inadequate.   Thus, injunctive relief is appropriate to ensure the Individual Defendants', Constellation's, Exelon's, and Bolt Acquisition's misconduct is corrected.

## COUNT II

### Against the Individual Defendants and Constellation for
### Violation of Section 20(a) of the Exchange Act

95.     Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

96.     The Individual Defendants acted as controlling persons of Constellation within the meaning of §20(a) of the 1934 Act as alleged herein.   By virtue of their positions as officers and/or directors of Constellation and their participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the S-4, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiff contends are false and misleading.

97.     Each of the Individual Defendants was provided with or had unlimited access to copies of the S-4 and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

98.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  In addition, as the S-4 sets forth at length, and as described herein, the Individual Defendants were all involved in negotiating, reviewing, and approving the Proposed Acquisition.  The S-4 purports to describe the various issues and information that they reviewed and considered, descriptions which must have had input from the Individual Defendants.  The S-4 at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Acquisition.  They were thus directly involved in the making of this document.

99.    By virtue of the foregoing, the Individual Defendants have violated §20(a) of the 1934 Act.

100.   As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Individual Defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the Individual Defendants' conduct, Constellation and its shareholders will be irreparably harmed.

## COUNT III

### Claim for Breach of Fiduciary Duties Against the Individual Defendants

101.   Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

102.   As members of the Company's Board, the Individual Defendants have fiduciary obligations to, inter alia: (i) undertake an appropriate evaluation of Constellation's net worth as a merger/acquisition candidate; (ii) take all appropriate steps to enhance Constellation's value and

attractiveness as a merger/acquisition candidate; (iii) act independently to protect the interests of the Company's public shareholders; (iv) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of Constellation's public shareholders; and (v) disclose all material information in soliciting shareholder approval of the Proposed Acquisition.

103.    The Individual Defendants have breached their fiduciary duties to the plaintiffs and the Class.

104.    As alleged herein, the Individual Defendants have initiated a process to sell Constellation that undervalues the Company and vests them with benefits that are not shared equally by Constellation's public shareholders.   In addition, by agreeing to the Proposed Acquisition, the Individual Defendants have capped the price of Constellation at a price that does not adequately reflect the Company's true value.   The Individual Defendants also failed to sufficiently inform themselves of Constellation's value, or disregarded the true value of the Company, in an effort to benefit themselves.   Furthermore, any alternate acquirer will be faced with engaging in discussions with a management team and Board that is committed to the Proposed Acquisition.   Moreover, Individual Defendants have failed to disclose material information concerning the Proposed Acquisition, necessary so that plaintiffs and other members of the Class can make an informed decision regarding the transaction.

105.    As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiffs and the other members of the Class.

## COUNT IV

### Claim for Aiding and Abetting Breaches of Fiduciary Duty
### Against Constellation and Exelon

106.    Plaintiffs repeat and re-allege the preceding allegations as if fully set forth herein.

107.     Defendants Constellation and Exelon knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Acquisition, which, without such aid, would not have occurred.   In connection with discussions regarding the Proposed Acquisition, Constellation provided, and Exelon obtained, sensitive, non-public information concerning Constellation's operations and thus had unfair advantages that enabled it to acquire the Company at an unfair and inadequate price.

108.     As a result of this conduct, plaintiffs and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their Constellation shares.

109.     Plaintiffs and the members of the Class have no adequate remedy at law.

### RELIEF REQUESTED

**WHEREFORE**, plaintiff demands judgment against defendants jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a class action;

B.     Certifying plaintiff as Class representative and his chosen counsel as Class counsel;

C.     Declaring and decreeing that the Merger Agreement was agreed to in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

D.     Rescinding, to the extent already implemented, the Merger Agreement or any of the terms thereof;

E.     Enjoining defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Acquisition, unless and until the Company: (i) adopts and implements a procedure or process reasonably designed to provide the best possible value for shareholders; and (ii) amends the S-4 so as to provide Constellation's

shareholders with all material information concerning the Proposed Acquisition as required by the Exchange Act;

F.       Directing the Individual Defendants to exercise their fiduciary duties to commence a sales process that is reasonably designed to secure the best possible consideration for, and obtain a transaction which is in the best interests of, Constellation's shareholders;

G.       Imposition of a constructive trust, in favor of plaintiff and the Class, upon any benefits improperly received by defendants as a result of their wrongful conduct;

H.       Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.       Granting such other and further equitable relief as this Court may deem just and proper.

Dated: August 30, 2011                          MASON LLP

                                                /s/ Gary E. Mason
                                                GARY E. MASON
                                                Md. Bar #15033
                                                1625 Massachusetts Ave., NW
                                                Suite 605
                                                Washington, DC 20036
                                                Telephone: (202) 429-2290
                                                Facsimile: (202) 429-2294

                                                ROBBINS UMEDA LLP
                                                BRIAN J. ROBBINS
                                                STEPHEN J. ODDO
                                                ARSHAN AMIRI
                                                LAUREN E. ROSNER
                                                600 B Street, Suite 1900
                                                San Diego, CA 92101
                                                Telephone: (619) 525-3990
                                                Facsimile: (619) 525-3991

                                                GOLDFARB BRANHAM LLP
                                                HAMILTON LINDLEY
                                                Saint Ann Court
                                                2501 N. Harwood Street, Suite 1801
                                                Dallas, TX 75201

Telephone: (214) 583-2257
Facsimile: (214) 583-2234

Attorneys for Plaintiff

644971